338 F.3d 407 Page 20
30 Employee Benefits Cas. 2249, Pens. Plan Guide (CCH) P 239840
(Cite as: 338 F.3d 407, 2003 WL 21557397 (5th Cir.(Tex.)))

single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality must necessarily be overinclusive or underinclusive. [FN158]

FN158. *Id.* at 236, 108 S.Ct. 978.

The Court reasoned that, in contrast to the Third Circuit's test, any determination of materiality requires "delicate assessments of inferences" a reasonable shareholder would draw "from a given set of facts and the significance of those inferences to him." [FN159] It explained that the Advisory Committee on Corporate Disclosure "cautioned the SEC against administratively confining materiality to a rigid formula" and added, "[c]ourts would do well to heed this advice." [FN160]

FN159. *Id.* (internal quotation marks omitted).

FN160. *Id.*

In conclusion, the Court stated that it could not find any valid justification "for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable investor, merely because agreement-in-principle ... has not yet been reached." [FN161] It also rejected the Sixth Circuit's approach, which provided that when a company denies engaging in merger discussions, information concerning those discussions becomes material by virtue of the statement denying their existence.*428 [FN162] It found that this approach failed to recognize that for liability to attach the statements must be misleading "as to a *material* fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." [FN163]

FN161. *Id.*

FN162. *Id.* at 237, 108 S.Ct. 978.

FN163. *Id.* at 238, 108 S.Ct. 978.

In contrast, it endorsed the Second Circuit's approach to materiality, which recognized that it was a fact-based inquiry and depended "upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." [FN164] At its core, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." [FN165]

FN164. *Id.* (internal quotation marks omitted).

FN165. *Id.* at 240, 108 S.Ct. 978.

**16 *Basic* suggests that we are not to rely on a bright-line test to determine whether a company's alleged misrepresentations are material. We therefore reject the *Fischer II* serious consideration approach to materiality, and adopt a fact-specific approach akin to that promulgated by the Second Circuit in *Ballone* and followed by the Ninth Circuit in *Wayne.* The overarching question in such an analysis is whether there is a substantial likelihood that a reasonable person in the plaintiffs' position would have considered the information an employer-administrator allegedly misrepresented important in making a decision to retire. [FN166] As the Second Circuit found, this entails consideration of a variety of factors, such "how significantly the statement misrepresents the present status of internal deliberations regarding future plan changes," whether the employee knew or should have been aware of "other information or statements from the company tending to minimize the importance of the misrepresentation," and "the specificity of the assurance." [FN167]

FN166. See *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 359 (5th Cir.2002).

FN167. *Ballone v. Eastman Kodak Co.,* 109 F.3d 117, 125 (2d Cir.1997).

Notwithstanding our rejection of serious consideration as a bright-line rule, we recognize, as

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 3:02-cv-00277-JCH    Document 55-5    Filed 11/03/2003    Page 2 of 5

338 F.3d 407 Page 21
30 Employee Benefits Cas. 2249, Pens. Plan Guide (CCH) P 23984O
(Cite as: 338 F.3d 407, 2003 WL 21557397 (5th Cir.(Tex.)))

did the Third Circuit in *Fischer I*, that the more seriously a plan is being considered, the more likely a representation about the plan is material. Our reservations with the serious consideration test do not lie in its solid underpinnings, which acknowledge the reality that businesses need be allowed some latitude in responding to employee inquiries about future plan changes since at some level the potential for such changes is virtually always being discussed. We hold only that the lack of serious consideration does not equate to a free zone for lying.

E.

[9] Taking up the second issue, whether an employer has a fiduciary duty to affirmatively disclose whether it is considering amending its benefit plan, we conclude that no such duty exists. Those circuits which have recognized the existence of such a duty have not presented persuasive reasons, and instead we find that the practicalities of the business world weigh against it. As one commentator has observed, imposing a fiduciary duty to disclose contemplated plan changes is "highly problematic" because, "unless any such duty is strictly limited, the normal decisionmaking processes of businesses will be disrupted and their ability to achieve legitimate *429 business goals will be hampered." [FN168] For example, a company "that for competitive reasons finds it necessary to reduce its workforce should not be prevented from pursuing a business plan under which an initial early retirement or severance pay plan will be improved if a sufficient number of employees do not elect to retire or terminate employment." [FN169] However, if courts were to impose an affirmative duty on employers to disclose such a plan of action, "it would be impossible to implement. Few employees would elect retirement or terminate employment after being informed that improved benefits would become available if an insufficient number of employees elect to participate." [FN170]

FN168. Bintz, *supra* 9, at 997.

FN169. *Id.*

FN170. *Id.*

Similarly, the Second Circuit, in concluding that an employer has no fiduciary duty to voluntarily disclose its consideration of a plan change, has reasoned that

**17 [u]ntil a plan is adopted, there is no plan, simply the possibility of one. Insisting on voluntary disclosure during the formulation of a plan and prior to its adoption would ... increase the likelihood of confusion on the part of beneficiaries and, at the same time, unduly burden management, which would be faced with continuing uncertainty as to what to disclose and when to disclose it. Moreover, any requirement of pre-adoption disclosure could impair the achievement of legitimate business goals....

Congress's main purpose in imposing a disclosure requirement on ERISA fiduciaries was to ensure that employees [would have] sufficient information and data to enable them to know whether the plan was financially sound and being administered as intended. Permitting plan fiduciaries to keep secret their pre-adoption deliberations and discussions in no way frustrates this purpose. Rather, such a bright-line rule protects the interests of beneficiaries, who will receive information at the earliest point at which their rights can possibly be affected, as well as the interests of fiduciaries, who will be required to provide information only at the point at which it becomes complete and accurate. [FN171]

FN171. *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 278-79 (2d Cir.1996) (internal quotation marks and citations omitted). Although the *Pocchia* court limited its holding to an employer's duty to disclose its consideration of a plan change in the absence of an employee inquiry, we believe its reasoning is equally applicable to the circumstance in which an employee asks about the status of a company's consideration of a plan change.

Moreover, this view finds support in the *Varity* Court's characterization of an employer's statements about prospective benefits as an "exercise of discretionary authority." It is also bolstered by the fact that ERISA itself, which includes broad disclosure duties on the part of an employer-administrator, omits mention of any duty on the part of an employer- administrator to disclose that it is considering amending the plan.

[10] Finally, our conclusion squares with the Court's pronouncement that a company does not act in a

338 F.3d 407                                                                                            Page 22
30 Employee Benefits Cas. 2249, Pens. Plan Guide (CCH) P 23984O
(Cite as: 338 F.3d 407, 2003 WL 21557397 (5th Cir.(Tex.)))

fiduciary capacity by simply amending a plan. [FN172] In *Lockheed Corp. v. Spink,* the Court explained:

> FN172. *See Lockheed Corp. v. Spink,* 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); *see also McCall v. Burlington N./Santa Fe Co.,* 237 F.3d 506, 511 (5th Cir.2000) (citing *Lockheed* for the proposition that "[a]n employer who adopts, amends, or terminates an employee benefit plan is not acting as a fiduciary").

**\*430** Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries.... [E]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans. When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust.
This rule is rooted in the text of ERISA's definition of fiduciary.... [O]nly when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration, does a person become an [ERISA] fiduciary.... [B]ecause [the] defined functions [in the definition of fiduciary] do not include plan design, an employer may decide to amend an employee benefit plan without being subject to fiduciary review. [FN173]

> FN173. *Spink,* 517 U.S. at 890, 116 S.Ct. 1783 (citations and internal quotation marks omitted).

However, "[a] court that imposes an affirmative duty to disclose proposed changes on employers must maintain," counter to this precedent, "that the act of amending a benefits plan is a fiduciary function." [FN174]

> FN174. Stover, *supra* note 8, at 731; *see also id.* ("Before a court can impose fiduciary duties on an employer, it must ensure that the employer is acting in a fiduciary capacity. ERISA's functional definition of 'fiduciary' prevents a court from extending its fiduciary duty to disclose to an employer in the act of amending its benefit plan. Communicating to an employee about her benefits plan is an act of plan administration; therefore, fiduciary duties attach when an administrator speaks. Considering whether to amend an employee benefits plan is not an act of plan administration, but an act of plan design. Because ERISA's functional definition of a fiduciary does not include designing a plan, fiduciary duties do not attach to an employer when it acts in this capacity." (internal citations omitted)).

We instead take the view that the proper course for an employer to follow is not to affect the employee's decision whether to retire in any way--not by lying to them to induce them to retire before implementation of an enhanced early retirement program, nor by being forced to tip off the employees to its business strategies to aid them in taking best advantage of the company's future plans. This middle road will allow the company to make its business decisions without hindrance while prohibiting it from tricking its employees into retirement by making guarantees it knows to be false.

**\*\*18** We believe the two views we have promulgated--that an employer has no affirmative duty to disclose the status of its internal deliberations on future plan changes even if it is seriously considering such changes, but if it chooses in its discretion to speak it must do so truthfully--coalesce to form a scheme that accomplishes Congress's dual purposes in enacting ERISA of protecting employees' rights to their benefits and encouraging employers to create benefit plans. As one commentator has explained:

> [A] limited duty can reasonably be imposed on fiduciaries to refrain from making, either in response to participant inquiries or at fiduciaries' own initiative, material misrepresentations.... Under such a standard, a fiduciary would not be prohibited from declining to comment on the prospect of future changes, or from making generalized statements to the effect that the plan sponsor always retains the right to amend a plan. [In this way,] businesses will not be unduly discouraged from adopting or amending early retirement, severance or other types of plans, and participants' interests **\*431** can be adequately protected from material misrepresentations that are intended to induce conduct that is contrary to their interests. [FN175]

Case 3:02-cv-00277-JCH   Document 55-5   Filed 11/03/2003   Page 4 of 5

338 F.3d 407 Page 23
30 Employee Benefits Cas. 2249, Pens. Plan Guide (CCH) P 23984O
(Cite as: 338 F.3d 407, 2003 WL 21557397 (5th Cir.(Tex.)))

> FN175. Bintz, *supra* note 9, at 998.

### IV.

The district court, not having the benefit of our guidance on this issue, applied *Fischer II* 's formulation of the serious consideration test. It determined that the summary judgment evidence, even when viewed in a light most favorable to the plaintiffs, revealed that executives at Schlumberger did not seriously consider the new plan at the time personnel representatives informed the plaintiffs that they had not heard of a new plan or that no new plan was in the works. On this basis the district court granted summary judgment in favor of Schlumberger as to plaintiffs' allegations that Schlumberger breached its duty to affirmatively disclose the changes and its duty not to misrepresent the possibility of future changes.

[11] In contrast to the district court's analysis, our approach requires that we divide the plaintiffs' allegations into two parts. First, the plaintiffs allege that Schlumberger violated its duty to disclose to the plaintiffs that it was considering an early retirement offering. Because we find that no such duty exists, we conclude that summary judgment was appropriate as to these allegations.

[12] The plaintiffs also contend that Schlumberger affirmatively misrepresented that no new plan would be forthcoming, or that it did not know that a plan was being formulated when in fact it was. According to plaintiff Martinez's deposition testimony, sometime prior to the week of his retirement Martinez visited the human resources office at Schlumberger and inquired "about the possibility of there being a [new voluntary early retirement] package." The personnel employee replied that "he hadn't heard of anything coming down." Similarly, plaintiff Ditta testified that in April or May 1998, he asked his boss about the possibility of such a package, and his boss stated that he had not heard of anything, but Ditta should ask personnel. Soon after, at a company party, Ditta asked his section head if he had "heard of any retirement package being offered." The section head replied that "he hadn't heard, let's go talk to" a representative from personnel. The personnel employee also stated that "he had not heard anything at this time," and added that "Schlumberger was doing too good right now and they would not be offering any packages because they'd lose too many good people." In May or June Ditta went to personnel and asked another employee about whether "she heard any kind of rumor of a package being offered," and she replied that "[s]he had not heard of anything." Along the same lines, more than a month before Plaintiff Kirksey retired, he inquired of the personnel office, "You are not giving out a package once I leave, are you?" and was told, "No, I ain't heard anything about a package."

We conclude that no genuine issue of material fact exists as to whether these statements were material or misleading. In simplest terms, the plaintiffs asked if Schlumberger planned to roll out an enhanced benefits plan in the near future, and were told that such a decision had not been made. Such statements could not have been material nor misleading until Schlumberger had actually decided to implement such a plan.

**19 [13][14] Nor are we troubled by the statement to Ditta that "Schlumberger *432 was doing too good right now and they would not be offering any packages because they'd lose too many good people." Although false statements, including statements about future plan changes such as those found in *Ballone,* may constitute material misrepresentations even if no plan change is being seriously considered at the time, [FN176] we are satisfied that any reasonable listener would understand the statement to Ditta to have been no more than the unsupported speculation of a fellow employee.

> FN176. In this regard, we note with approval the Ninth Circuit's statement in *Wayne* that "[a] person actively misinforms by saying that something is true when it is not true," and also "by saying that something is true when the person does not know whether it is true or not." *Wayne v. Pac. Bell,* 238 F.3d 1048, 1055 (9th Cir.2001).

For these reasons, we AFFIRM the judgment of the district court. Schlumberger had no affirmative duty to communicate the status of its internal deliberations regarding a possible plan change, and in responding to the plaintiff's inquiries it did not materially misrepresent the possibility of a change.

338 F.3d 407, 2003 WL 21557397 (5th Cir.(Tex.)), 30 Employee Benefits Cas. 2249, Pens. Plan Guide (CCH) P 23984O

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

338 F.3d 407 Page 24
30 Employee Benefits Cas. 2249, Pens. Plan Guide (CCH) P 23984O
**(Cite as: 338 F.3d 407, 2003 WL 21557397 (5th Cir.(Tex.)))**

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works