# EXHIBIT A

## AFFIDAVIT OF JOY RICK

I, Joy Rick, being duly sworn, do hereby depose and say:

1. I am over the age of eighteen and believe in the obligations of an oath.

2. I have personal knowledge of the facts set forth in this affidavit, and they are true and accurate to the best of my knowledge and belief.

3. I currently hold the position of Vice-President and Secretary and have been employed by SBC Communications Inc. ("SBC") since June 20, 1972.

4. On August 18, 2000, Stan Sigman, then Chief Operating Officer of SBC, met with several managers, including me, and instructed us to begin preparing proposals for an incentive program for employees to voluntarily terminate their employment. He informed us that the prior day, August 17, 2000, senior officers of the corporation had met to discuss a voluntary downsizing. We were asked to prepare some specific proposals which could later be presented to the officers of SBC for consideration. Thus, as of August 17, 2000, SBC was not considering any specific proposals for conducting a voluntary downsizing; and it did not consider implementing any specific EPR proposals until well after August 18, 2000.

_____
Joy Rick

STATE OF TEXAS         §
                       §
COUNTY OF BEXAR        §

BEFORE ME, the undersigned authority, on this day personally appeared _____
Rick_____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER my hand and seal of office this 25th day of October, 2003.

_____
Notary Public, State of Texas

My commission expires: 12-30-03

[Notary Seal: Sheila H Nilsson, My Commission Expires December 30, 2003]

# ZITO DEP.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - - - -X
MICHAEL G. ZITO, JR.,                :
          Plaintiff                  :
                                     :
VS                                   : 3:02CV277(JCH)
                                     :
SBC PENSION BENEFIT PLAN, SBC        :
COMMUNICATIONS, INC., SOUTHERN       :
NEW ENGLAND TELEPHONE COMPANY and    :
PRICEWATERHOUSE LLP,                 :
          Defendants                 :
- - - - - - - - - - - - - - - - - - -X
```

Deposition of MICHAEL G. ZITO, JR. taken at the offices of Tyler, Cooper & Alcorn, 205 Church Street, New Haven, Connecticut, before Audra Quinn, RPR, Licensed Shorthand Reporter #106, and Notary Public, in and for the State of Connecticut on April 30, 2003, at 10:00 a.m.



DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

| 117 RANDI DRIVE | 100 PEARL ST., 14th FL. |
| --- | --- |
| MADISON, CT 06443 | HARTFORD, CT 06103-4506 |
| 203 245-9583 | 800 839-6867 |

1  of one but was keeping it secret from you?
2      A   No, I'm not claiming that.
3      Q   Is that the same with respect to Diane O'Falt
4  who we'll get to in a minute?
5      A   As far as her being --
6      Q   You're not claiming that she knew about a
7  package but was keeping it secret from you, are you?
8      A   No, I'm not claiming that.
9      Q   And you're not claiming that Ann Rotatori did
10 that, are you?
11     A   No.
12     Q   Are you claiming that anyone that you talked
13 to about packages kept a plan for severance secret from
14 you intentionally?
15     A   I have to say no.
16     Q   Who did you ask about packages?  Tell me all
17 the names, please.
18     A   Bill Youell, Diane O'Falt, Ann Rotatori,
19 Jackie Jaritta.
20     Q   Is that it?
21     A   Well, those were the main participants.
22 Bill Youell being my immediate supervisor got the brunt
23 of the questions, I guess.
24     Q   So you asked Bill Youell that question more
25 often than any of the others.  Is that fair to say?

```
1      Q    Did that make sense to you?
2      A    Yes.
3      Q    And that was a reasonable response?
4      A    That was something that I kept in touch with
5   him on.
6      Q    And you did, in fact, give a fair amount of
7   notice before you left because you told Diane in
8   mid-February and you didn't leave until April 7th which
9   was a good amount of notice.  Right?
10     A    Yes.
11     Q    So that wasn't an unreasonable response, was
12  it?
13     A    No.
14     Q    So you're not claiming, then, are you, that
15  Bill Youell made a misrepresentation to you?  Are you?
16     A    No.
17     Q    And let's talk about Diane O'Falt.  I'm going
18  to ask you similar questions about her.  You said you
19  didn't ask her that kind of question as often, but did
20  you ask her what is the status of packages, is that the
21  question?
22     A    I asked her what the status of packages were
23  and she indicated that she had no knowledge of any
24  package and she didn't seem to feel that any were on
25  the horizon.
```

```
 1      Q    Tell me precisely what she said.
 2      A    That there was no package and that she
 3  doubted if any were on the horizon.
 4      Q    Do you have any reason to believe that that
 5  was not true, that she was lying to you, that she had
 6  no knowledge of any package and she doubted if any was
 7  on the horizon?
 8      A    Was she lying to me?
 9      Q    Yes.
10      A    No.
11      Q    Do you claim that Diane O'Falt misrepresented
12  something to you?
13      A    To my knowledge, no.
14      Q    How many times did you ask Diane O'Falt --
15      A    A couple.
16      Q    -- about the status of packages?
17      A    A couple, twice.
18      Q    When did you ask her?
19      A    Once before she left to go on vacation and
20  then when she came back from vacation.
21      Q    So once was mid-February, 2000?
22      A    Just before she left.  Just before -- yes, it
23  was approximately mid-February.
24      Q    Or early to mid-February, 2000?
25      A    Whatever.
```

```
 1   question, what is the status of packages?
 2        A    Yes.
 3        Q    That's basically the same question you asked
 4   her?
 5        A    Yes.  It was up on the third floor conference
 6   room.  I remember that.
 7        Q    And you asked her that once and only once?
 8        A    Once.
 9        Q    When did that occur?
10        A    It was in March.
11        Q    March of 2000?
12        A    March of 2000.
13        Q    So that's after you had announced your
14   retirement and the date for your retirement.  Is that
15   fair to say?
16        A    Yes.  And after I talked to Bill Youell and
17   Diane O'Falt.
18        Q    What did Ann respond to you?
19        A    That there was no packages and that she
20   wasn't aware of any.
21        Q    Is that the best you can recall of what she
22   said?
23        A    As I recall.
24        Q    Do you have any reason to think she was
25   lying?
```

```
1      A    No.
2      Q    Do you have any reason to think that she was
3  misrepresenting things to you?
4      A    To my knowledge, no.
5      Q    Have you found her to be a fair and honest
6  person based on your dealings with her?
7      A    Based on my dealings with her up to that
8  particular point in time, yes.
9      Q    And how about Diane O'Falt?
10     A    Well, Diane I only worked for a month.
11     Q    Do you have any reason to doubt her honesty
12 or her integrity?
13     A    No.  No.  And the same would apply to Bill.
14     Q    You knew I was going there.
15     A    Yes.
16     Q    Jackie Jaritta, what is she?
17     A    She was in human resources.
18     Q    Human resources for your business group?
19     A    External affairs.  I don't recall if she was
20 strictly for our business group, but she was there.
21     Q    Where did she work?  In North Haven?
22     A    No.  Downtown New Haven.  I believe on Church
23 Street.
24     Q    Just two doors down?
25     A    I believe it was one of the Church Street
```

1    A    She wasn't aware of any package, doubted if
2  any package was coming down.
3    Q    And are you finished with your answer?
4    A    Yes.
5    Q    Do you have any reason to think she was lying
6  to you?
7    A    No.
8    Q    Do you have any reason to think she
9  misrepresented the facts to you?
10   A    To the best of my knowledge, no.
11   Q    When was the last time you asked anyone at
12 SNET or SBC about packages?
13   A    The conversation I had with Ann Rotatori in
14 the third floor conference room.
15   Q    And that was in March of 2000?
16   A    Yes.
17   Q    Can you be any more specific?  Was it early
18 March, late March?
19   A    I can't recall the time frame.  I recall it
20 was the third floor conference room.  I recall it was
21 in March, but I can't recall the specific date or
22 anything like that.
23   Q    How can we find out that date?  Was it in the
24 context of a meeting, a bigger meeting that you were
25 having with her or did you just go see her?

1  package. It appeared, from what I knew at that
2  particular point in time, that it was the type of
3  package that I would have wanted.
4    Q    Okay. Let's go back to --
5    A    But I can't recall specifically who told me.
6    Q    Let's go back to the time period before
7  April 7th of 2000 when you were asking questions over a
8  period of a couple years. Are you claiming that anyone
9  at SNET or SBC made an affirmative misrepresentation to
10 you concerning a package?
11   A    No.
12   Q    And, clearly, you've already said that no one
13 lied to you as far as you know?
14   A    To the best of my knowledge, no.
15   Q    And you're not claiming that anyone was
16 trying to induce you to retire before a package was
17 announced so that you wouldn't get it, are you?
18   A    To the best of my knowledge, I would have to
19 say no.
20   Q    Did anybody force you to retire?
21   A    No.
22   Q    Did Diane pressure you to retire earlier than
23 you wanted to?
24   A    No. She was disappointed that I was
25 retiring.

1    Q    She thought you were a good employee.  Right?

2    A    I was a good employee.

3    Q    And it was a burden for her in a way to
4  switch gears?

5    A    It was a burden because she had to scramble
6  to get an account executive to take my place.  And,
7  again, those accounts that were mine that I took with
8  her into her module and the new ones that she gave me
9  had to be assigned and, again, that was one of the
10 reasons I stayed an extra month.  I could have left in
11 two weeks.

12   Q    Did she ask you to stay a little longer?

13   A    No.  I volunteered that to her.  Did she ask
14 me to stay beyond April 7th?  I told her that if she
15 wanted me to that I would, that day wasn't cast in
16 stone, but she never took me up on the offer.

17   Q    But you didn't get the feeling that she was
18 eager for you to leave in any way, did you?

19   A    She didn't want me to leave.

20   Q    And you never got the feeling that
21 Bill Youell wanted you to leave the company, did you?

22   A    Well, Bill wanted to know about my plans for
23 planning purposes.

24   Q    Right.  So that if you left, he could plan
25 your successor.  Right?

```
 1
 2                    C E R T I F I C A T E
 3
 4        I hereby certify that I am a Notary Public, in and
 5   for the state of Connecticut, duly commissioned and
 6   qualified to administer oaths.
 7        I further certify that the deponent named in the
 8   foregoing deposition was by me duly sworn, and
 9   thereupon testified as appears in the foregoing
10   deposition; that said deposition was taken by me
11   stenographically in the presence of counsel and reduced
12   to typewriting under my direction, and the foregoing is
13   a true and accurate transcript of the testimony.
14        I further certify that I am neither of counsel nor
15   attorney to either of the parties to said suit, nor am
16   I an employee of either party to said suit, nor of
17   either counsel in said suit, nor am I interested in the
18   outcome of said cause.
19        Witness my hand and seal as Notary Public this
20   __22nd__ day of ___May_____, 2003.
21
22                              _____
                                Audra Quinn, RPR, LSR
23                              Notary Public
24   My commission expires:  7/31/2006
     LSR No. 106
25
```

# ROTATORI DEP.

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - - -X
MICHAEL G. ZITO, JR.,               :
              Plaintiff             :
                                    :
VS                                  :  3:02CV277(JCH)
                                    :
SBC PENSION BENEFIT PLAN, SBC       :
COMMUNICATIONS, INC., SOUTHERN      :
NEW ENGLAND TELEPHONE COMPANY and   :
PRICEWATERHOUSE LLP,                :
              Defendants            :
- - - - - - - - - - - - - - - - - -X
```

Deposition of ANN ROTATORI taken at the offices of Tyler, Cooper & Alcorn, 205 Church Street, New Haven, Connecticut, before Audra Quinn, RPR, Licensed Shorthand Reporter #106, and Notary Public, in and for the State of Connecticut on May 16, 2003, at 2:09 p.m.



DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

| 117 RANDI DRIVE | 100 PEARL ST., 14th FL. |
| --- | --- |
| MADISON, CT 06443 | HARTFORD, CT 06103-4506 |
| 203 245-9583 | 800 839-6867 |

1  for me.  I don't know why they did what they did.

2      Q    Which group is that?

3      A    The global group back in 2000.  I was not

4  part of their planning nor their process.

5      Q    Excuse me just for a second.  When was that

6  EPR announced where things are unclear?

7      A    September 7th of 2000.  So that's when

8  leadership team became aware of it, the SNET local

9  team.  We then had lots of questions, had to find out

10 what the corporate expectation of it was, what were we

11 trying to accomplish and were then able to set out

12 what -- I was able to set out what my implementation of

13 it would be, which was I capped it at various titles.

14     Q    And did you do that under your authority?

15          MS. ALEXANDER:  Object to the form.

16     Q    The capping?

17     A    It was not my sole authority.  It was my

18 request and recommendation that later got approved.

19     Q    Can you describe in some detail how you came

20 to the cap level that you did?

21     A    Well, sure.  When we found out that the offer

22 was on the table and that going into 2001 the company

23 wanted us to operate with fewer people, I got with my

24 leadership team, the BCS leadership team to discuss how

25 we could accomplish that, you know, how big would the

```
 1              any follow-up questions.
 2              (THEREUPON, A RECESS WAS TAKEN
 3              FROM 3:31 TO 3:38.)
 4    CROSS-EXAMINATION
 5    BY MS. ALEXANDER:
 6        Q    Just a couple of quick follow-up questions.
 7    Ms. Rotatori, you were asked about conversations with
 8    Michael Zito concerning an EPR or quote/unquote
 9    package.  Right?
10        A    Correct.
11        Q    And you testified that you didn't
12    specifically recall the words that were said between
13    the two of you, you and Mr. Zito.  Is that right?
14        A    Correct.
15        Q    To the best of your recollection, without
16    necessarily using the precise words that you used, what
17    was your response to Mr. Zito when he asked you about
18    packages?
19        A    I get asked the question about packages
20    somewhat regularly and I have sort of a standard
21    response that says, you know, that I will find out five
22    minutes before they do, that I'm not aware of any
23    offer.
24        Q    Is that an accurate and truthful statement?
25        A    Absolutely.
```

```
 1
 2                    C E R T I F I C A T E
 3
 4        I hereby certify that I am a Notary Public, in and
 5   for the state of Connecticut, duly commissioned and
 6   qualified to administer oaths.
 7        I further certify that the deponent named in the
 8   foregoing deposition was by me duly sworn, and
 9   thereupon testified as appears in the foregoing
10   deposition; that said deposition was taken by me
11   stenographically in the presence of counsel and reduced
12   to typewriting under my direction, and the foregoing is
13   a true and accurate transcript of the testimony.
14        I further certify that I am neither of counsel nor
15   attorney to either of the parties to said suit, nor am
16   I an employee of either party to said suit, nor of
17   either counsel in said suit, nor am I interested in the
18   outcome of said cause.
19        Witness my hand and seal as Notary Public this
20   23rd day of May, 2003.
21
22                                    _____
                                      Audra Quinn, RPR, LSR
23                                    Notary Public
24   My commission expires:  7/31/2006
     LSR No. 106
25
```