# EXHIBIT A

## AFFIDAVIT OF JOY RICK

I, Joy Rick, being duly sworn, do hereby depose and say:

1. I am over the age of eighteen and believe in the obligations of an oath.

2. I have personal knowledge of the facts set forth in this affidavit, and they are true and accurate to the best of my knowledge and belief.

3. I currently hold the position of Vice-President and Secretary and have been employed by SBC Communications Inc. ("SBC") since June 20, 1972.

4. On August 18, 2000, Stan Sigman, then Chief Operating Officer of SBC, met with several managers, including me, and instructed us to begin preparing proposals for an incentive program for employees to voluntarily terminate their employment. He informed us that the prior day, August 17, 2000, senior officers of the corporation had met to discuss a voluntary downsizing. We were asked to prepare some specific proposals which could later be presented to the officers of SBC for consideration. Thus, as of August 17, 2000, SBC was not considering any specific proposals for conducting a voluntary downsizing; and it did not consider implementing any specific EPR proposals until well after August 18, 2000.

_____
Joy Rick

STATE OF TEXAS          §
                        §
COUNTY OF BEXAR         §

BEFORE ME, the undersigned authority, on this day personally appeared Joy Rick, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER my hand and seal of office this _____ day of _____, 20___.

_____

Notary Public, State of Texas

My commission expires: _____

Sheila H Nilsson
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires
December 30, 2003

# ZITO DEP.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - -X
MICHAEL G. ZITO, JR.,                    :
                    Plaintiff            :
                                         :
VS                                       : 3:02CV277(JCH)
                                         :
SBC PENSION BENEFIT PLAN, SBC            :
COMMUNICATIONS, INC., SOUTHERN           :
NEW ENGLAND TELEPHONE COMPANY and        :
PRICEWATERHOUSE LLP,                     :
                    Defendants           :
- - - - - - - - - - - - - - - - - -X


        Deposition of MICHAEL G. ZITO, JR. taken at
        the offices of Tyler, Cooper & Alcorn,
        205 Church Street, New Haven, Connecticut,
        before Audra Quinn, RPR, Licensed Shorthand
        Reporter #106, and Notary Public, in and for
        the State of Connecticut on April 30, 2003,
        at 10:00 a.m.



        DEL VECCHIO REPORTING SERVICES, LLC
          PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE                100 PEARL ST., 14th FL.
MADISON, CT 06443              HARTFORD, CT 06103-4506
   203 245-9583                   800 839-6867

1    of one but was keeping it secret from you?

2        A    No, I'm not claiming that.

3        Q    Is that the same with respect to Diane O'Falt

4    who we'll get to in a minute?

5        A    As far as her being --

6        Q    You're not claiming that she knew about a

7    package but was keeping it secret from you, are you?

8        A    No, I'm not claiming that.

9        Q    And you're not claiming that Ann Rotatori did

10   that, are you?

11       A    No.

12       Q    Are you claiming that anyone that you talked

13   to about packages kept a plan for severance secret from

14   you intentionally?

15       A    I have to say no.

16       Q    Who did you ask about packages?  Tell me all

17   the names, please.

18       A    Bill Youell, Diane O'Falt, Ann Rotatori,

19   Jackie Jaritta.

20       Q    Is that it?

21       A    Well, those were the main participants.

22   Bill Youell being my immediate supervisor got the brunt

23   of the questions, I guess.

24       Q    So you asked Bill Youell that question more

25   often than any of the others.  Is that fair to say?

1       Q    Did that make sense to you?

2       A    Yes.

3       Q    And that was a reasonable response?

4       A    That was something that I kept in touch with

5    him on.

6       Q    And you did, in fact, give a fair amount of

7    notice before you left because you told Diane in

8    mid-February and you didn't leave until April 7th which

9    was a good amount of notice.  Right?

10      A    Yes.

11      Q    So that wasn't an unreasonable response, was

12   it?

13      A    No.

14      Q    So you're not claiming, then, are you, that

15   Bill Youell made a misrepresentation to you?  Are you?

16      A    No.

17      Q    And let's talk about Diane O'Falt.  I'm going

18   to ask you similar questions about her.  You said you

19   didn't ask her that kind of question as often, but did

20   you ask her what is the status of packages, is that the

21   question?

22      A    I asked her what the status of packages were

23   and she indicated that she had no knowledge of any

24   package and she didn't seem to feel that any were on

25   the horizon.

```
 1        Q    Tell me precisely what she said.

 2        A    That there was no package and that she

 3   doubted if any were on the horizon.

 4        Q    Do you have any reason to believe that that

 5   was not true, that she was lying to you, that she had

 6   no knowledge of any package and she doubted if any was

 7   on the horizon?

 8        A    Was she lying to me?

 9        Q    Yes.

10        A    No.

11        Q    Do you claim that Diane O'Falt misrepresented

12   something to you?

13        A    To my knowledge, no.

14        Q    How many times did you ask Diane O'Falt --

15        A    A couple.

16        Q    -- about the status of packages?

17        A    A couple, twice.

18        Q    When did you ask her?

19        A    Once before she left to go on vacation and

20   then when she came back from vacation.

21        Q    So once was mid-February, 2000?

22        A    Just before she left.  Just before -- yes, it

23   was approximately mid-February.

24        Q    Or early to mid-February, 2000?

25        A    Whatever.
```

1   question, what is the status of packages?

2       A    Yes.

3       Q    That's basically the same question you asked

4   her?

5       A    Yes.  It was up on the third floor conference

6   room.  I remember that.

7       Q    And you asked her that once and only once?

8       A    Once.

9       Q    When did that occur?

10      A    It was in March.

11      Q    March of 2000?

12      A    March of 2000.

13      Q    So that's after you had announced your

14  retirement and the date for your retirement.  Is that

15  fair to say?

16      A    Yes.  And after I talked to Bill Youell and

17  Diane O'Falt.

18      Q    What did Ann respond to you?

19      A    That there was no packages and that she

20  wasn't aware of any.

21      Q    Is that the best you can recall of what she

22  said?

23      A    As I recall.

24      Q    Do you have any reason to think she was

25  lying?

```
 1      A    No.

 2      Q    Do you have any reason to think that she was

 3   misrepresenting things to you?

 4      A    To my knowledge, no.

 5      Q    Have you found her to be a fair and honest

 6   person based on your dealings with her?

 7      A    Based on my dealings with her up to that

 8   particular point in time, yes.

 9      Q    And how about Diane O'Falt?

10      A    Well, Diane I only worked for a month.

11      Q    Do you have any reason to doubt her honesty

12   or her integrity?

13      A    No.  No.  And the same would apply to Bill.

14      Q    You knew I was going there.

15      A    Yes.

16      Q    Jackie Jaritta, what is she?

17      A    She was in human resources.

18      Q    Human resources for your business group?

19      A    External affairs.  I don't recall if she was

20   strictly for our business group, but she was there.

21      Q    Where did she work?  In North Haven?

22      A    No.  Downtown New Haven.  I believe on Church

23   Street.

24      Q    Just two doors down?

25      A    I believe it was one of the Church Street
```

1      A     She wasn't aware of any package, doubted if

2   any package was coming down.

3      Q     And are you finished with your answer?

4      A     Yes.

5      Q     Do you have any reason to think she was lying

6   to you?

7      A     No.

8      Q     Do you have any reason to think she

9   misrepresented the facts to you?

10     A     To the best of my knowledge, no.

11     Q     When was the last time you asked anyone at

12  SNET or SBC about packages?

13     A     The conversation I had with Ann Rotatori in

14  the third floor conference room.

15     Q     And that was in March of 2000?

16     A     Yes.

17     Q     Can you be any more specific?  Was it early

18  March, late March?

19     A     I can't recall the time frame.  I recall it

20  was the third floor conference room.  I recall it was

21  in March, but I can't recall the specific date or

22  anything like that.

23     Q     How can we find out that date?  Was it in the

24  context of a meeting, a bigger meeting that you were

25  having with her or did you just go see her?

```
 1   package.  It appeared, from what I knew at that

 2   particular point in time, that it was the type of

 3   package that I would have wanted.

 4        Q    Okay.  Let's go back to --

 5        A    But I can't recall specifically who told me.

 6        Q    Let's go back to the time period before

 7   April 7th of 2000 when you were asking questions over a

 8   period of a couple years.  Are you claiming that anyone

 9   at SNET or SBC made an affirmative misrepresentation to

10   you concerning a package?

11        A    No.

12        Q    And, clearly, you've already said that no one

13   lied to you as far as you know?

14        A    To the best of my knowledge, no.

15        Q    And you're not claiming that anyone was

16   trying to induce you to retire before a package was

17   announced so that you wouldn't get it, are you?

18        A    To the best of my knowledge, I would have to

19   say no.

20        Q    Did anybody force you to retire?

21        A    No.

22        Q    Did Diane pressure you to retire earlier than

23   you wanted to?

24        A    No.  She was disappointed that I was

25   retiring.
```

1    Q    She thought you were a good employee.  Right?

2    A    I was a good employee.

3    Q    And it was a burden for her in a way to

4  switch gears?

5    A    It was a burden because she had to scramble

6  to get an account executive to take my place.  And,

7  again, those accounts that were mine that I took with

8  her into her module and the new ones that she gave me

9  had to be assigned and, again, that was one of the

10  reasons I stayed an extra month.  I could have left in

11  two weeks.

12    Q    Did she ask you to stay a little longer?

13    A    No.  I volunteered that to her.  Did she ask

14  me to stay beyond April 7th?  I told her that if she

15  wanted me to that I would, that day wasn't cast in

16  stone, but she never took me up on the offer.

17    Q    But you didn't get the feeling that she was

18  eager for you to leave in any way, did you?

19    A    She didn't want me to leave.

20    Q    And you never got the feeling that

21  Bill Youell wanted you to leave the company, did you?

22    A    Well, Bill wanted to know about my plans for

23  planning purposes.

24    Q    Right.  So that if you left, he could plan

25  your successor.  Right?

1

2                          C E R T I F I C A T E

3

4          I hereby certify that I am a Notary Public, in and

5    for the state of Connecticut, duly commissioned and

6    qualified to administer oaths.

7          I further certify that the deponent named in the

8    foregoing deposition was by me duly sworn, and

9    thereupon testified as appears in the foregoing

10   deposition; that said deposition was taken by me

11   stenographically in the presence of counsel and reduced

12   to typewriting under my direction, and the foregoing is

13   a true and accurate transcript of the testimony.

14         I further certify that I am neither of counsel nor

15   attorney to either of the parties to said suit, nor am

16   I an employee of either party to said suit, nor of

17   either counsel in said suit, nor am I interested in the

18   outcome of said cause.

19         Witness my hand and seal as Notary Public this

20   _22nd_ day of ___May___, 2003.

21

22                          _Audra Quinn_
                            Audra Quinn, RPR, LSR
23                          Notary Public

24   My commission expires:  7/31/2006
     LSR No. 106
25

**ROTATORI DEP.**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - - -X
MICHAEL G. ZITO, JR.,                :
                Plaintiff            :
                                     :
VS                                   : 3:02CV277(JCH)
                                     :
SBC PENSION BENEFIT PLAN, SBC        :
COMMUNICATIONS, INC., SOUTHERN       :
NEW ENGLAND TELEPHONE COMPANY and    :
PRICEWATERHOUSE LLP,                 :
                Defendants           :
- - - - - - - - - - - - - - - - - -X




        Deposition of ANN ROTATORI taken at the
        offices of Tyler, Cooper & Alcorn, 205 Church
        Street, New Haven, Connecticut, before Audra
        Quinn, RPR, Licensed Shorthand Reporter #106,
        and Notary Public, in and for the State of
        Connecticut on May 16, 2003, at 2:09 p.m.





        DEL VECCHIO REPORTING SERVICES, LLC
        PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE              100 PEARL ST., 14th FL.
MADISON, CT 06443            HARTFORD, CT 06103-4506
  203 245-9583                 800 839-6867

1  for me.  I don't know why they did what they did.

2      Q    Which group is that?

3      A    The global group back in 2000.  I was not

4  part of their planning nor their process.

5      Q    Excuse me just for a second.  When was that

6  EPR announced where things are unclear?

7      A    September 7th of 2000.  So that's when

8  leadership team became aware of it, the SNET local

9  team.  We then had lots of questions, had to find out

10  what the corporate expectation of it was, what were we

11  trying to accomplish and were then able to set out

12  what -- I was able to set out what my implementation of

13  it would be, which was I capped it at various titles.

14      Q    And did you do that under your authority?

15           MS. ALEXANDER:  Object to the form.

16      Q    The capping?

17      A    It was not my sole authority.  It was my

18  request and recommendation that later got approved.

19      Q    Can you describe in some detail how you came

20  to the cap level that you did?

21      A    Well, sure.  When we found out that the offer

22  was on the table and that going into 2001 the company

23  wanted us to operate with fewer people, I got with my

24  leadership team, the BCS leadership team to discuss how

25  we could accomplish that, you know, how big would the

1              any follow-up questions.

2              (THEREUPON, A RECESS WAS TAKEN

3              FROM 3:31 TO 3:38.)

4    CROSS-EXAMINATION

5    BY MS. ALEXANDER:

6        Q    Just a couple of quick follow-up questions.

7    Ms. Rotatori, you were asked about conversations with

8    Michael Zito concerning an EPR or quote/unquote

9    package.  Right?

10       A    Correct.

11       Q    And you testified that you didn't

12   specifically recall the words that were said between

13   the two of you, you and Mr. Zito.  Is that right?

14       A    Correct.

15       Q    To the best of your recollection, without

16   necessarily using the precise words that you used, what

17   was your response to Mr. Zito when he asked you about

18   packages?

19       A    I get asked the question about packages

20   somewhat regularly and I have sort of a standard

21   response that says, you know, that I will find out five

22   minutes before they do, that I'm not aware of any

23   offer.

24       Q    Is that an accurate and truthful statement?

25       A    Absolutely.

1

2                    C E R T I F I C A T E

3

4        I hereby certify that I am a Notary Public, in and

5   for the state of Connecticut, duly commissioned and

6   qualified to administer oaths.

7        I further certify that the deponent named in the

8   foregoing deposition was by me duly sworn, and

9   thereupon testified as appears in the foregoing

10  deposition; that said deposition was taken by me

11  stenographically in the presence of counsel and reduced

12  to typewriting under my direction, and the foregoing is

13  a true and accurate transcript of the testimony.

14       I further certify that I am neither of counsel nor

15  attorney to either of the parties to said suit, nor am

16  I an employee of either party to said suit, nor of

17  either counsel in said suit, nor am I interested in the

18  outcome of said cause.

19       Witness my hand and seal as Notary Public this

20  ___23rd___ day of ___May_____, 2003.

21

22                              _____
                                Audra Quinn, RPR, LSR
23                              Notary Public

24  My commission expires:  7/31/2006
    LSR No. 106
25